Slip Op. 22-10

## UNITED STATES COURT OF INTERNATIONAL TRADE

BOTH-WELL (TAIZHOU) STEEL
FITTINGS, CO., LTD.,

     Plaintiff,

v.

UNITED STATES,

     Defendant,

and

BONNEY FORGE CORPORATION,

     Defendant-Intervenor.

Before: Claire R. Kelly, Judge

Court No. 21-00166

## OPINION AND ORDER

[Remanding the U.S. Department of Commerce's final determination in the first administrative review of the countervailing duty order covering forged steel fittings from the People's Republic of China.]

Dated: February 8, 2022

Peter Koenig and Jeremy W. Dutra, Squire Patton Boggs (US) LLP, of Washington, D.C. for plaintiff Both-Well (Taizhou) Steel Fittings, Co., Ltd.

Claudia Burke, Assistant Director, and Kara M. Westercamp, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C. for defendant. Also on the brief were Brian M. Boynton, Acting Assistant Attorney General, and Jeanne E. Davidson, Director. Of counsel on the brief was Jared M. Cynamon, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington D.C.

Court No. 21-00166                                                                    Page 2

Roger B. Schagrin, Christopher T. Cloutier, Benjamin J. Bay, and Michelle R. Avrutin, Schagrin Associates, of Washington, D.C. for defendant-intervenor Bonney Forge Corporation.

Kelly, Judge: Before the court is Both-Well (Taizhou) Steel Fittings, Co., Ltd.'s ("Both-Well") rule 56.2 motion for judgment on the agency record challenging the U.S. Department of Commerce's ("Commerce") final determination in the 2018 administrative review of the countervailing duty ("CVD") order on forged steel fittings ("FSF") from the People's Republic of China ("China"). See Pl.'s Mot. for J. on Agency R., Aug. 30, 2021, ECF No. 25 ("Pl.'s Mot."); [FSF] from [China],86 Fed. Reg. 14,722 (Dep't Commerce Mar. 18, 2021) (final results of [CVD] Admin. Review; 2018) ("Final Results") and accompanying Issues and Decision Memo., C-570-068, (Mar. 10, 2021), ECF No. 19-5 ("Final Decision Memo."); [FSF] from [China], 83 Fed. Reg. 60,396 (Dep't Commerce Nov. 26, 2018) ([CVD] Order) ("FSF CVD Order"). Both-Well challenges Commerce's decision to use facts available with an adverse inference to assign a CVD rate of 10.54% for its use of China's Export Buyer's Credit Program ("EBCP") despite unrebutted evidence of non-use from Both-Well and its U.S. customers (the "non-use certifications," "Customer Declaration," or "declarations"). Memo. of Points and Authorities in Supp. of [Pl.'s Mot.] 4–8, Aug. 30, 2021, ECF No. 25 ("Pl.'s Br."). Defendant counters that Commerce lawfully and reasonably resorts to facts available with an adverse inference because the Government of China (the "GOC") failed to cooperate to the best of its ability by failing to provide Commerce with information about the administration of the EBCP necessary to verify the non-

use certifications, creating a gap in the record. Def.'s Resp. to [Pl.'s Mot.] at 11–21, Nov. 2, 2021, ECF No. 30 ("Def.'s Br."). Commerce filled the gap using facts available with an adverse inference and determined that Both-Well benefitted from the EBCP. Id. at 18. For the following reasons, the court remands Commerce's Final Results.

## BACKGROUND

Commerce issued a CVD order covering FSF from China in 2018. FSF CVD Order. On January 17, 2020, Commerce initiated an administrative review of the FSF CVD Order, at the request of Both-Well and domestic producer Bonney Forge Corporation ("Bonney Forge") for the period of March 14, 2018 through December 31, 2018. Letter from Roger B. Schagrin and Christopher T. Cloutier, Schagrin Associates to Sec. of Commerce Re: [FSF] from China: Request for Admin. Review, PD 2, Doc No. 3916313- 01 (Nov. 27, 2019); Letter from Peter Koenig, Squire Patton Boggs (US) LLP to Sec. of Commerce Re: [FSF] from China: Antidumping, PD 3, Doc. No. 3916587- 01 (Nov. 27, 2019); Initiation of Antidumping and [CVD] Admin. Reviews, 85 Fed. Reg. 3,014, 3,022 (Dep't Commerce Jan. 17, 2020).[1] On March 12, 2020, petitioners Bonney Forge and the United Steel, Paper, Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union

---

[1] On May 25, 2021, Defendant submitted indices to the public and confidential administrative records underlying Commerce's final determination. These indices are located on the docket at ECF Nos. 19-2 and 19-3, respectively. All references in this opinion to documents from the administrative record underlying Commerce's final determination are identified by the numbers assigned by Commerce in those indices and preceded by "PD" and "CD" to denote public or confidential documents.

alleged that Both-Well may have received preferential lending through the EBCP.
Letter from Roger B. Schagrin and Christopher T. Cloutier, Schagrin Associates to
Sec. of Commerce Re: [FSF] from China: New Subsidy Allegation, PD 36, Doc No.
3953930-01 (Mar. 13, 2020) ("New Subsidy Allegation"); Decision Memo. for the
Preliminary Results: Admin. Review of the [CVD] Order on [FSF] from [China] C-
570-068 3, PD 85, Doc. No. 4050966-01 (Dep't Commerce Nov. 20, 2020) ("Prelim.
Decision Memo."). The EBCP is a program backed by the GOC providing medium-
and long-term loans to importers at preferential, low interest rates to finance eligible
projects. See Final Decision Memo. at 11, 19, 23 n.99.

On April 7, 2020, Commerce initiated an investigation into the New Subsidy
Allegation and issued questionnaires to Both-Well and the GOC seeking additional
information about the use and administration of the EBCP. Memo. from Janae
Martin and Kate Johnson, International Trade Compliance Analysts, Antidumping
and Countervailing Duty Operations to Irene Darzenta Tzafolias, Director Office
VIII, Re: Decision Memo. for New Subsidy Allegation, PD 42, Doc No. 3962212-01
(Apr. 7, 2020); Letter from Rebecca Trainor, Program Manager, AD/CVD Operations,
Office VIII, Dep't Commerce to Mr. Gu Yu, First Secretary, Embassy of [China],
Economic and Commercial Office Re: Admin. Review of the [CVD] Order on [FSF]
from [China]: New Subsidy Allegations Questionnaire, PD 45, Doc No. 3962767-01
(Apr. 8, 2020) ("GOC Questionnaire"); Letter from [Commerce] to Peter Koenig,
Squire Patton Boggs (US) LLP Re: 2018 Admin. Review of the [CVD] Order on [FSF]

from [China]: New Subsidy Allegations Questionnaire for Both-Well, PD 46, Doc. No. 3962772-01 (Apr. 8, 2020); Prelim. Decision Memo. at 3.

Both-Well and the GOC timely responded to Commerce's questionnaires. Resp. from [China] Ministry of Commerce, Trade Remedy and Investigation Bureau to [Commerce] Re: GOC New Subsidy Allegation Questionnaire Response: First Admin. Review of the [CVD] Investigation on [FSF] from [China] (C-570-068), PD 54, CD, 14 Doc. No. 3966875-01 (Apr. 21, 2020) ("GOC NSA Resp."); Resp. from Squire Patton Boggs (US) LLP to [Commerce] Re: [FSF] from China, PD 60, CD 16, Doc. No. 3969927-01 (Apr. 22, 2020) ("Both-Well NSA Resp."). Both-Well certified that it did not benefit from the EBCP and "it did not assist any of its customers in obtaining buyer's credits, and never had contact nor was associated with China's Ex-Im Bank during the period of review." Pl.'s Br. at 2; see also Both-Well NSA Resp. at 2–3. Both-Well included a list of its customers and non-use certifications from all its U.S. customers certifying that they did not finance any purchases from Both-Well using the EBCP in its response. Both-Well NSA Resp. at Exs. NSA-1, NSA-2; see also Pl.'s Br. at 2.

In both its initial questionnaire and a subsequent supplemental questionnaire, Commerce requested that the GOC provide the information in Commerce's Standard Questions Appendix,[2] the 2013 revisions to the Administrative Regulations (the

---

[2] "The Standard Questions Appendix request[s] various information that Commerce

(footnote continued)

"2013 Administrative Regulations") for the EBCP, and a list of partner or correspondent banks[3] involved with the disbursement of EBCP funds.  Final Decision Memo. at 16–18; see also GOC Questionnaire; Letter from [Commerce] to Embassy of [China] re: Admin. Review of the [CVD] Order of [FSF] from [China]: GOC Supplemental Questionnaire, PD 74, Doc No. 4002506-01 (July 16, 2020) ("GOC Supplemental Questionnaire").   The GOC did not provide all the documents requested by Commerce and instead confirmed that none of Both-Well's U.S. customers "applied for, used, or benefitted from the alleged program during the P[eriod] O[f] I[vestigation]"[4] therefore, "a response to the Standard Questions Appendix is not necessary."  GOC NSA Resp. at 1.  Furthermore, the GOC stated that in light of the non-use, Commerce's request for a list of intermediary banks was

---

requires in order to analyze the specificity and financial contribution of [the EBCP], including . . . translated copies of the laws and regulations pertaining to the [EBCP]; a description of the agencies and types of records maintained for administration of the program; a description of the program and the application process; program eligibility criteria; and program usage."  Final Decision Memo. at 16.

[3] Commerce's questionnaire to the GOC requests a list of "partner/correspondent banks," GOC Questionnaire at 4, however, Commerce refers to these banks by a variety of names in the Final Decision Memo.  See, e.g., Final Decision Memo. at 11 ("third-party banks"), 18 ("intermediary banks"), 18 n.73 ("correspondent banks"). For clarity, the court will refer to these banks as intermediary banks.

[4] The GOC stated that it received Both-Well's customer list and provided it to the China Export-Import Bank.  GOC NSA Resp. at 3.  The China Export-Import Bank stated that it searched its records and confirmed that none of the listed customers received "Export Buyers Credits" from the China Export-Import Bank during the period of review.  Id.  The GOC attached screenshots of the search results to its response.  GOC NSA Resp. at Ex. 4.

"overly broad . . . and . . .unnecessary."[5]  Id. at 3.  The GOC failed to provide the 2013

Administrative Regulations because it claimed they are "internal to the [China

Export-Import] [B]ank, non-public, and not available for release."  GOC NSA Resp.,

Ex. 1 at 3; see also Letter re: [GOC Supplemental Questionnaire] 2, PD 78, Doc No.

4004744-01 (July 22, 2020) ("GOC NSA Supp. Resp.").

        In the Final Decision Memo. Commerce determined that it was unable to verify

the non-use certifications provided by Both-Well and its U.S. customers because the

GOC failed to provide necessary information pertaining to the administration of the

EBCP.  Final Decision Memo. at 15–20.  Specifically, Commerce explained that it

could not verify the non-use certifications without the names of the intermediary

banks that might appear in the books and records of the recipient because record

evidence indicates that the EBCP uses a "complicated structure of loan

disbursements."  Id. at 18–19.  Commerce also determined that verification of the

non-use certifications is further complicated by revisions to the EBCP made in 2013,

which may have eliminated the $2 million minimum disbursement requirement,

increasing the number of potential loans for Commerce to review.  Id. at 17–18.

Consequently, Commerce determined that it lacked information necessary to verify

the non-use certifications due to the GOC's failure to cooperate, creating a gap in the

record that Commerce filled using facts available with an adverse inference.  Id. at

---

[5] The GOC directed Commerce to decisions from this Court "which [have] held that information such as the EX-IM Bank's internal guidelines are not necessary or material to the question of non-usage."  Id. at 5.

23, 25–26. Commerce assigned Both-Well a countervailable subsidy rate of 10.54%.

Id. at 27. Both-Well now challenges Commerce's decision to disregard the non-use certifications on the record and use facts available with an adverse inference. Pl.'s Br. at 1.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to § 516A(a)(2)(B)(iii) of the Tariff Act of 1930 as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2018),[6] and 28 U.S.C. § 1581(c) (2018), which grant the court authority to review actions contesting the final determination in an administrative review of a CVD order. The court will uphold Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(iii).

## DISCUSSION

Both-Well argues that Commerce's decision to use facts available with an adverse inference to find that Both-Well benefited from the EBCP and assign Both-Well a 10.54% CVD rate for its use is unsupported by substantial evidence. Pl.'s Br. at 4–8. Both-Well argues it provided unrebutted non-use certifications from all its U.S. customers stating they did not benefit from the EBCP. Id. Furthermore, Both-Well argues that Commerce did not attempt to verify the non-use certifications and therefore cannot conclude there is a gap in the record warranting the use of facts

---

[6] Further citations to the Tariff Act of 1930, as amended, are to the relevant provision of Title 19 of the U.S. Code, 2018 edition.

available with an adverse inference.  Id. at 9–12.  Defendant argues that the use of

facts available with an adverse inference is supported by substantial evidence and in

accordance with law because the GOC failed to cooperate to the best of its ability

when it failed to provide necessary information regarding the administration of the

EBCP requested by Commerce.  Def.'s Br. at 11–21.  Without the requested

information, Defendant asserts Commerce could not verify the non-use certifications,

resulting in a gap in the record and the need to use facts available with an adverse

inference.  Id. at 19, 21.  Defendant-Intervenor Bonney Forge argues Commerce

should not rely on the non-use certifications because the GOC failed to provide

necessary information about the administration of the EBCP, preventing Commerce

from verifying non-use.  Def-Intervenor's Resp. Br. in Opp. to [Pl.'s Mot.] 6–9, Nov. 2,

2021, ECF No. 29.

If Commerce determines that a foreign government or public entity "is

providing, directly or indirectly, a countervailable subsidy with respect to the

manufacture, production, or export of a class or kind of merchandise imported, or sold

(or likely to be sold) for importation, into the United States," Commerce will impose

a duty in the amount equal to the net countervailable subsidy.  19 U.S.C. § 1671(a).

A subsidy is countervailable when a foreign government provides a financial

contribution that confers a benefit and is specific, i.e., provided to a particular

industry, enterprise, or for the purpose of export.  See 19 U.S.C. § 1677(5)(B), (5A).

In countervailing duty investigations, Commerce requires information regarding

subsidies from both the foreign government and the producers or exporters.  Essar

Steel Ltd. v. United States, 34 C.I.T. 1057, 1070) (2010), aff'd in part, rev'd in part on

other grounds, 678 F.3d 1268 (Fed. Cir. 2012)).    When Commerce is missing

information necessary to make a countervailing duty determination, it must use facts

otherwise available to fill the gap in the record created by the missing information.[7]

See 19 U.S.C. § 1677e(a).  If a gap exists and a party failed to cooperate to the best of

its ability,[8] Commerce may use an adverse inference when selecting facts available

to fill the gap.  19 U.S.C. § 1677e(b).  In cases where Commerce confronts non-use

certifications connected to the EBCP, determining that a gap exists requires

Commerce to explain "exactly what information is missing from the record necessary

to verify non-use" and why "only the withheld information can fill the gap."[9]  See

---

[7] The Statement for Administrative Action indicates that Commerce may resort to facts otherwise available if "requested information is missing from the record or cannot be used because, for example, it has not been provided, it was provided late, or Commerce could not verify the information."   Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1, at 869 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4209.  Commerce must "consider information requested from interested parties that: (1) is on the record; (2) was filed within the applicable deadlines; and (3) can be verified."  Id.

[8] A respondent cooperates to the best of its ability when it does "the maximum it is able to do."  Nippon Steel Corp. v. United States, 337 F.3d 1373, 1382 (Fed. Cir. 2003).

[9] Prior court opinions have provided a framework for explaining what Commerce must do to support a decision to use facts available with an adverse inference. Jiangsu Zhongji Lamination Materials Co. v. United States, 405 F. Supp. 3d 1317, 1333 (Ct. Int'l Trade 2019) (Commerce must "(1) define the gap in the record by explaining exactly what information is missing from the record necessary to verify non-use; (2) establish how the withheld information creates this gap by explaining

(footnote continued)

Jiangsu, 405 F. Supp. 3d at 1333; see also Guizhou III, 523 F. Supp. 3d at 1359–61 &

nn.43–48 (collecting cases).  Although using facts available with an adverse inference

may be permissible, doing so when it collaterally affects a cooperating party is

disfavored.  Fine Furniture (Shanghai) Ltd. v. United States, 36 C.I.T. 1206, 1212

n.10 (2012), aff'd, 748 F.3d 1365 (Fed. Cir. 2014); GPX Int'l Tire Corp. v. United

States, 37 C.I.T. 19, 58–59 (2013), aff'd, 780 F.3d 1136 (Fed. Cir. 2015) (Commerce is

expected to consider evidence on the record that fills the gaps created by the

government's lack of cooperation); Changzhou Trina Solar Energy Co. v. United

States, No. 17-00246, 2019 WL 6124908, at *3 (Ct. Int'l Trade Nov. 18, 2019)

("Changzhou IV") (citing Archer Daniels Midland Co. v. United States, 917 F. Supp.

2d 1331, 1342 (Ct. Int'l Trade 2013)).

     In this case, Both-Well submitted non-use certifications from its U.S.

customers supporting Both-Well's claim of non-use and detracting from Commerce's

conclusion to the contrary.  Both-Well NSA Resp. at Ex. NSA-2.  Commerce explains

that it cannot verify the non-use certifications because the record is missing two

pieces of information: the 2013 Administrative Regulations, specifically whether the

---

why the information the GOC refused to give was necessary to verify claims of non-use; and (3) show that only the withheld information can fill the gap by explaining why other information, on the record or accessible by respondents, is insufficient or impossible to verify"); see also Guizhou Tyre Co., Ltd. v. United States, 523 F. Supp. 3d 1312, 1361 (Ct. Int'l Trade 2021) ("Guizhou III").  The court assumes familiarity with this framework and adds that essentially this test boils down to whether the missing information is the only information that can be used to verify the non-use certifications.

China Export-Import Bank eliminated the $2 million threshold required to receive an Export Buyers Credit, and a list of intermediary banks authorized to disburse Export Buyers Credits.[10]    Final Decision Memo. at 17–18.    Commerce specifically requested this information from the GOC twice and the GOC failed to provide it.    See id. at 16–17 (citing GOC Questionnaire; GOC Supplemental Questionnaire). Commerce concludes that verification of the non-use certifications without the missing information "would be extremely difficult, if not impossible."    Id. at 20. Commerce explains that it currently understands that the EBCP provides loans to a respondent's customers in unknown amounts and may route those loans from the China Export-Import Bank to customers through intermediary banks, an understanding that has evolved since its initial investigation of the program in 2012.[11] Id. at 11–18.  Commerce speculates that a U.S. customer seeking an Export

---

[10] Commerce finds the GOC's response deficient in "two key respects," namely the GOC's failure to provide the intermediary bank list and the 2013 Administrative Regulations. Final Decision Memo. at 17–18. However, Commerce later asserts that even if this information was provided to Commerce, verification would not be possible. Id. at 21 (explaining that even if the GOC provided the intermediary bank list and confirmed whether the $2 million threshold was removed, Commerce would still need examples of the documents required to apply for and receive the Export Buyers Credit in order to complete verification). On remand, Commerce should clarify exactly what missing information is necessary for verification.

[11] Commerce's initial understanding of the EBCP was that the program provided short- and medium-term loans directly from the China Export-Import Bank to the borrowers, i.e., a respondent's customers, without the involvement of third parties such as exporters or intermediate banks. Id. at 11–12. Commerce's understanding of the EBCP began changing in 2014 with Citric Acid and Certain Citrate Salts, 79

(footnote continued)

Court No. 21-00166                                                                 Page 13

Buyers Credit may obtain funding through the following process: first a customer opens a loan account for an Export Buyers Credit with an intermediary bank or the China Export-Import Bank.  See Id. at 19.  Next, the requested funding is sent from the China Export-Import Bank to the customer's bank account.  Id.  Finally, the funds are sent to the respondent's bank account.  Id.  Commerce states that the recipients of an Export Buyers Credit may not be limited to the customer of a company respondent.  Id. at 23 ("the potential recipients of the export buyer's credits are not limited to the customers of the company respondent, as they may be received by [intermediary] banks"); Def.'s Br. at 17; see also GOC NSA Resp., Ex. 1 at 5 ("the borrower must be an importer or a bank approved by the China Ex[port]-Im[port] Bank").  Commerce's account of its concerns provides an explanation of why it wants the 2013 Administrative Regulations and a list of intermediary banks authorized to disburse Export Buyers Credits.

       As has happened in several cases before this Court, although Commerce explains why it wants the information it seeks, it fails to explain why that information is necessary, i.e., why it is the only information that can verify the U.S. customers' non-use certifications.  See Clearon Corp. v. United States, 474 F. Supp. 3d 1339, 1353 (Ct. Int'l Trade 2020) ("Clearon II").  Commerce explains what it wants from the

Fed. Reg. 78,799 (Dep't Commerce Dec. 31, 2014) (Final Results of [CVD] Admin. Review; 2012), when Commerce began to gain a better understanding of how and when the EBCP disbursed funds. Id. at 14.  In 2016, Commerce began requesting the 2013 Administrative Regulations and learned that Export Buyers Credits may be disbursed through correspondent banks. Id. at 14–16.

GOC, and why it wants it. <u>See</u> <u>Guizhou III</u>, 523 F. Supp. 3d at 1364 (explaining that Commerce's assertion that the missing intermediary bank and threshold information prevented Commerce from understanding "'the flow to and from foreign buyers'. . . sounds reasonable" but Commerce failed to explain why Commerce could not track the flow of the Export Buyers Credits without such information). Commerce explains that both the 2013 Administrative Regulations, specifically confirmation of the existence of a $2 million minimum threshold, and the intermediary bank list provide necessary parameters for verification. Final Decision Memo. at 17–18, 24. The intermediary bank list guides Commerce by indicating which loans from which banks to flag when reviewing the books and records of a respondent and its U.S. customers. <u>Id.</u> at 19–20. Knowing if a minimum threshold for EBCP loans exists further narrows

the number of loans that must be reviewed.[12]    Id. at 17–18.    Thus, Commerce

adequately lays out its reasoning of why what it seeks is useful.[13]

Commerce's explanation of why the information it seeks from the GOC is

useful is a necessary, but not sufficient, justification for its determination that it

cannot verify the information.    See Guizhou III, 523 F. Supp. 3d at 1359–61 & nn.43–

48 (collecting cases holding same).    Put simply, Commerce fails to show that the

---

[12] Both-Well argues "Commerce conflates the operation of the [EBCP] with its use (or non-use)," noting courts have recognized a distinction between the operation of a subsidy program and "the 'existence and amount of the benefit conferred' under the program." Pl.'s Br. at 5 (quoting Essar, 34 C.I.T. at 1070), 6, 10; see also Reply Br. in Supp. of [Pl.'s Mot.] 2–3, Nov. 30, 2021, ECF No. 31. Both-Well correctly identifies the distinction but its argument is unpersuasive. As an initial matter, the Essar court explains that foreign governments are in a better position to provide information regarding the administration of subsidy programs and respondent companies are in a better position to provide information regarding the "existence and amount of the benefit conferred." Essar 34 C.I.T. at 1070. Commerce requires information from both parties to make a CVD determination. See id. at 1070–71. Both-Well argues that because it provided Commerce with non-use certifications from its U.S. customers, Both-Well has confirmed the non-existence of the subsidy and therefore, information about the administration of the EBCP is immaterial. Pl.'s Br. at 6. However, understanding  how the EBCP is administered aides in the verification of the non-use certifications. See Final Decision Memo. at 19–25. (explaining that Commerce requires information about the administration of the EBCP to request the proper documents during the verification process and ensure completeness of the information provided).

[13] Indeed, as noted by the Guizhou III court, Commerce provides some explanation of why at least some of the information held by the GOC is useful. Guizhou III, 523 F. Supp. 3d at 1364, 1364 n.50 (comparing Commerce's explanation for needing information from the GOC in Guizhou III to Commerce's explanation in its remand redetermination in Clearon II). Nonetheless, information is necessary not only because it is useful for a purpose, but also because it is uniquely useful for that purpose, i.e., no other information can serve that purpose. Cf. id. at 1364 (noting Commerce failed to explain how the lack of the information it sought otherwise crippled its efforts).

information it seeks is the only information it can use to verify the non-use
certifications. For example, although the GOC states that it cannot compel the China
Export-Import Bank to turn over the 2013 Administrative Regulations, GOC NSA
Supp. Resp. at 2, and "a response to the Standard Questions Appendix is not
necessary," <u>id.</u>, it is unclear to the court why Both-Well's U.S. customers might not
have that information, or other information allowing Commerce to verify the non-use
certifications and why Commerce could not ask Both-Well to obtain such information
from its customers. <u>See</u> <u>Changzhou IV</u>, 2019 WL 6124908 at *3 (directing "the parties
[to] discuss potential ways forward and Commerce should request records that may
answer the question of EBCP use from respondent, and, if necessary, their
importers").

Indeed, the U.S. customers' non-use certifications themselves suggest that the
customers must have information that could be used to verify the non-use
certifications. <u>See</u> Both-Well NSA Resp. at Ex. NSA-2. Commerce could ask Both-
Well's U.S. customers for detailed explanations of how they were able to certify that
they did not participate in the EBCP. <u>See</u> <u>Clearon II</u>, 474 F. Supp. 3d at 1354
(instructing the parties "to confer and jointly devise a procedure, which may include
modifications of the usual method, by which [Commerce] can conduct verification of
the declarations of non-use"). Presumably, the non-use certifications resulted from
some meaningful review by the U.S. customers which could be confirmed with

appropriate documentation.[14]  <u>See</u> Both-Well NSA Resp. at Ex. NSA-2.  Both-Well's

U.S. customers certified that they "did not borrow money or otherwise finance . . .

purchases through the use of the [EBCP] (or any other export buyer credit program

made available through any arm of the [GOC])."  <u>Id.</u>  Each Customer Declaration

states that the U.S. customer did not act directly or indirectly "through any third-

party bank."  <u>Id.</u> ¶ 4.  In order to make these declarations, customers must have a

methodology to review their books and records before certifying non-use of the EBCP.

Further, each Customer Declaration asserts the customer is "willing to cooperate

with any additional request for information and invites [Commerce] to verify the

source of [the] Company's short- and medium-term borrowings."  <u>Id.</u> ¶ 5.  One of

Commerce's questions to Both-Well's U.S. customers might be whether they knew the

identity of the intermediary banks used by the China Export-Import Bank, and if

they did not, how they could possibly certify non-use.[15]  If they had knowledge of the

---

[14] It is reasonably discernable from Commerce's supposition of how the EBCP operates, as well as the Final Decision Memo. as a whole, that Commerce believes that there is a distinct application for the EBCP that a customer is required to fill out before receiving an Export Buyers Credit.  <u>See</u> Final Decision Memo. at 11, 19, 21, 23.  Presumably, Commerce could ask Both-Well or its U.S. customers to procure an application.  <u>See</u> Both-Well NSA Resp. at Ex. NSA-2 ¶ 5.  Commerce could then use the application to review the documents underlying the books and records of Both-Well and its U.S. customers.

[15] As the U.S. customers certified they did not apply for an Export Buyers Credit indirectly, they should be able to demonstrate how they could so certify.  <u>See</u> Both-Well NSA Resp. at Ex. NSA-2 ¶ 4.

intermediary banks, their explanations might lead to a simpler verification path.[16]

See Final Decision Memo. at 21–22. Alternatively their explanations, or their lack of

knowledge regarding the intermediary banks, might lead to the conclusion that

indeed only the GOC can provide the necessary information because either (i) the

non-use certifications were not the result of meaningful reviews, or (ii) the path laid

out by the customers establishes that it would be too onerous for Commerce to verify

the non-use certifications.

Commerce states that it would be too onerous "if not impossible" for it to verify

the non-use certifications. Final Decision Memo. at 21–22. It is reasonably

discernible that Commerce believes that the burden of examining the number of

documents and ledgers necessary to confirm the accuracy of the non-use certifications

makes the task nearly impossible. Final Decision Memo. at 20, 24. Commerce's

position assumes that it cannot narrow the scope of its inquiry. See Guizhou III, 523

F. Supp. 3d at 1372–73 (noting Commerce's logic regarding the burden it faces is not

unfounded). But to know whether it can narrow the scope, or establish an alternative

---

[16] Commerce states that "There is no indication on the record that other parties had
access to information regarding the [intermediary] banks utilized by the China
Ex[port]-Im[port] Bank." Final Decision Memo at 18 n.73. Yet, the non-use
certifications would appear to be record evidence that the U.S. customers had
knowledge of the identity of the intermediary banks or at least a means to establish
that a bank was not an intermediary. Both-Well NSA Resp. at Ex. NSA-2. Otherwise
the U.S. customers would not have been able to certify non-use. Thus, the first
question Commerce may wish to ask the U.S. customers is how they would know if
they obtained an Export Buyers Credit through an intermediary of the China Export-
Import Bank and how they could demonstrate that they did not receive an Export
Buyers Credit.

method of verification, Commerce needs to ask the Both-Well and its U.S. customers

for assistance.  See Guizhou Tyre Co. v. United States, 415 F. Supp. 3d 1335, 1344

(Ct. Int'l Trade 2019) ("Guizhou II") (instructing Commerce to use a variety of tools

to attempt to verify the non-use"); Clearon II, 474 F. Supp. 3d at 1354 (same).[17]

Here, Both-Well suggested that Commerce verify the non-use certifications by

visiting Both-Well and its U.S. customers.  Case Br. Both-Well [FSF] from [China]

(C-570-068) 10, Doc. No. 4066953-01 (Dec. 18, 2020); Pl.'s Br. at 10.  It is unclear

whether Both-Well suggested a path to narrow the scope of work Commerce would

encounter.  More information from the U.S. customers may assist Commerce with

cross-referencing the importers' and exporter's records to see if any funds originated

from the China Export-Import Bank.  Changzhou Trina Solar Energy Co., Ltd. v.

United States, No. 17-00198, 2019 WL 5856438, *1, 3 n.7, 4 (Ct. Int'l Trade Nov. 8,

2019) ("Changzhou III").  See also Guizhou III, 523 F. Supp. 3d at 1370–72; Jiangsu,

405 F. Supp. 3d at 1334; Guizhou II, 415 F. Supp. 3d at 1343 ("If the record contains

information that could close the gap, Commerce must attempt to verify the

_____

[17] The court appreciates the burden Commerce faces when attempting verification using third parties.  See CS Wind Vietnam Co. v. United States, 219 F. Supp. 3d 1273, 1279, 1284 (Ct. Int'l Trade 2017), aff'd, 721 F. App'x 993 (Fed. Cir. 2018).  However, Commerce can attempt verification by asking Both-Well's U.S. customers to explain their certification methodology. Although Commerce has previously chosen to forgo using facts available with an adverse inference rather than attempting to verify the non-use certifications, it is unclear to the court why Commerce would not at least attempt to ask for the information from customers before concluding any attempt at verification would be too difficult.  See, e.g., Clearon Corp. v. United States, Ct. No. 17-00171, 2021 WL 1821448 (Ct. Int'l Trade May 6, 2021) ("Clearon III") (reaching its determination under protest).

information on the record"). Thus, it is unclear to the court how Commerce can assert

that the GOC information is indeed necessary, when it has not sought alternative

means to verify the non-use certifications.[18]

Thus, on remand if Commerce wishes to continue using facts available with an

adverse inference, it must attempt to verify the non-use certifications by either asking

Both-Well to have its U.S. customers explain in detail how the customers were able

to certify that they did not either directly or indirectly benefit from the ECBP, or

through some other alternative means of verifying the non-use certifications.[19]  See

---

[18] What might be required in each case will depend on the record in that case.  In some cases there are many customers, here seven, and in others only one.  Changzhou III, 2019 WL 5856438 at *4.  Some cases lacked non-use certifications from customers. Changzhou Trina Solar Energy Co., Ltd. v. United States, 195 F. Supp. 3d 1334, 1355 (Ct. Int'l Trade 2016) ("Changzhou I").  In some cases, Commerce attempted to visit the China Export-Import Bank to verify, and others it did not.  Compare id. at 1354 (Commerce attempted to visit the China Export-Import Bank and was told it lacked the "proper authorization" to review the records); RZBC Grp. Shareholding Co. v. United States, 15-00022, 2016 WL 3880773 (Ct. Int'l Trade June 30, 2016) (Commerce attempted to visit the China Export-Import Bank but was denied access); Cooper (Kunshan) Tire Co., Ltd. v. United States, 539 F. Supp. 3d 1316, 1328 (Ct. Int'l Trade 2021) (the GOC asserts that requested information is "'internal to the bank, non-public, and not available for release.'") with Clearon Corp. v. United States, 359 F. Supp. 3d 1344 (Ct. Int'l Trade 2019) ("Clearon I") (and its progeny); Guizhou Tyre Co., Ltd. v. United States, 348 F. Supp. 3d 1261 (Ct. Int'l Trade 2018) ("Guizhou I") (and its progeny); Changzhou Trina Solar Energy Co., Ltd. v. United States, 255 F. Supp. 3d 1312 (Ct. Int'l Trade 2017) ("Changzhou II") (and its progeny); Yama Ribbons and Bows Co. v. United States, 419 F. Supp. 3d 1341 (Ct. Int'l Trade 2019) (and its progeny) (Commerce did not attempt to visit the China Export-Import Bank). Therefore, the reasonableness of Commerce's approach will be case specific to some degree.

[19] The Court has proposed several alternative methodologies for verification. Changzhou III, 2019 WL 5856438, at *4 (proposing cross-referencing the importers' and exporter's records); Changzhou IV, 2019 WL 6124908 at *4 (same); see Guizhou III, 523 F. Supp. 3d at 1344 (proposing spot checks).

Court No. 21-00166                                                    Page 21

Jiangsu, 405 F. Supp. 3d at 1334; Guizhou II, 415 F. Supp. 3d at 1343; Clearon II,

474 F. Supp. 3d at 1353–54; Changzhou IV, 2019 WL 6124908 at *3.  If Commerce

attempts verification and determines verification is not possible without the missing

information, Commerce must explain, in detail, the specific ways in which Commerce

attempted verification of the non-use certifications.

## CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Commerce's application of facts available with an adverse

inference in calculating Both-Well's CVD rate is remanded to the agency for further

explanation or reconsideration consistent with this Opinion and Order; and it is

further

**ORDERED** that Commerce shall file its remand determination with the court

within 90 days of the date of this Opinion and Order; and it is further

**ORDERED** that the parties shall have 30 days thereafter to file comments on

the remand determination; and it is further

**ORDERED** that the parties shall have 30 days thereafter to file a reply to

comments on the remand determination; and it is further

**ORDERED** that the parties shall have 14 days thereafter to file the Joint

Appendix; and it is further

Court No. 21-00166                                                          Page 22

     **ORDERED** that Commerce shall file the administrative record within 14 days

of the date of filing of its remand redetermination.


                                   /s/ Claire R. Kelly
                                   Claire R. Kelly, Judge

Dated:       February 8, 2022
               New York, New York